United States District Court
Southern District of Texas
**ENTERED**
September 16, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DURPHY TAYLOR, *et al.*, | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:22-cv-00312 |
| | § | |
| TRANQUILITY GARDENS, INC., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Plaintiffs Durphy Taylor ("Taylor") and Andrea Carter ("Carter") bring this case against Defendants Tranquility Gardens, Inc. ("Tranquility") and Tona Keller ("Keller"). Plaintiffs allege Defendants failed to pay them minimum wage and overtime wages as mandated by the Fair Labor Standards Act ("FLSA"). Plaintiffs also allege Defendants violated the FLSA by failing to maintain accurate records, and that those FLSA violations were willful.

Keller has moved for summary judgment, arguing she is not an "employer" under the FLSA and, therefore, not subject to personal liability. *See* Dkt. 31.

## BACKGROUND

Tranquility is a Texas corporation that provides living space, meals, and general observation to elderly and disabled individuals. Keller is Tranquility's sole shareholder. Plaintiffs worked for Tranquility for a short period of time in 2022.

In her Motion for Summary Judgment, Keller argues that although she owns "the house out of which the business operated, . . . she was not involved with Tranquility's business operations." Dkt. 31 at 2. Keller insists that her friend, Fouzia Akhter ("Akhter"), "ran the day-to-day operations and controlled the business." *Id.* More to the point, Keller contends that she "did not hire nor recommend the hiring of any of the Plaintiffs"; "did not terminate or recommend the termination of any of the Plaintiffs"; "did not set the schedules of Plaintiffs";

"did not make any recommendations or decisions about Plaintiffs' pay or hours worked"; "did not act directly or indirectly in the interest of Tranquility in relation to its employees"; and "did not have personal knowledge of either the hours Plaintiffs worked, or how and when they were paid." *Id.*

Plaintiffs implicitly concede that, if these facts were true, Keller would not be considered an employer under the FLSA. Plaintiffs insist, however, that evidence in the summary judgment record creates a genuine dispute as to the veracity of Keller's claims that she was uninvolved with Tranquility's operations.

## LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine issue of material fact exists when there is evidence sufficient for a rational trier of fact to find for the non-moving party." *Schnell v. State Farm Lloyds*, 98 F.4th 150, 156 (5th Cir. 2024) (quotation omitted). The moving party bears the burden of demonstrating a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once satisfied, the burden shifts to the non-movant to show the existence of a genuine fact issue for trial. *See id.* at 324. "[T]he non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007) (quotation omitted). I "may not make credibility determinations or weigh the evidence." *Total E&P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013). Finally, I "must view the facts and evidence in the light most favorable to the nonmovants and draw all reasonable inferences in their favor." *Schnell*, 98 F.4th at 156.

## B.    THE FLSA

"The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). "Workers covered under the [FLSA] are entitled to a minimum wage and overtime compensation." *Klick v. Cenikor Found.*, 94 F.4th 362, 368 (5th Cir. 2024) (citing 29 U.S.C. §§ 206–07). "To be bound by the requirements of the [FLSA], one must be an 'employer.'" *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984) (quoting 29 U.S.C. §§ 206–07).

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "[T]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). The Fifth Circuit applies the "'economic reality' test to determine whether an individual or entity is an employer for the purposes of the FLSA." *Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 251 (5th Cir. 2012). "The test originates in the Supreme Court's holding that 'economic reality' should govern the determination of employer status under the FLSA." *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012) (quoting *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)).

The four-factor economic reality test set forth in *Gray* considers whether an alleged employer: "(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Gray*, 673 F.3d at 355. "While each element need not be present in every case, finding employer status when none of the factors is present would make the test meaningless." *Id.* at 357. Determining whether a person is an "employer" under the FLSA "must focus upon the totality of the circumstances,

3

underscoring the economic realities of the [plaintiffs'] employment." *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983).

## ANALYSIS

Keller contends that "[n]o reasonable trier of fact, considering the facts of the record together with the economic reality test, could possibly find that Tona Keller is an employer under the FLSA." Dkt. 31 at 12. Plaintiffs disagree, arguing the first three of the four *Gray* factors reveal genuine disputes of material fact over whether Keller qualifies as an employer under the FLSA. I address each *Gray* factor in turn.

### A. POWER TO HIRE AND FIRE EMPLOYEES

At her deposition, Keller repeatedly testified that she did not hire or fire Tranquility employees. *See* Dkt. 31-1 at 14 (testifying that she "[n]ever" had "any conversations with [Akhter] about terminating either one of [Plaintiffs]," and that Akhter "[n]ever" asked Keller "for permission on whether or not she can terminate somebody"); *id.* at 15 (testifying she did not have "conversations with [Akhter] about Andrea Carter and her leaving [or termination]"); *id.* at 22 (testifying she "never" had conversations with Akhter about "hiring and firing"); *id.* at 25 ("I made no decisions as far as hiring and firing.").

Akhter also testified that she—not Keller—usually handled the hiring and firing of Tranquility employees. *See* Dkt. 31-2 at 9 (including "hiring [and] firing the employees" among her duties); *id.* at 16–17 (describing procedures she uses to hire employees); *id.* at 21 (testifying that she "personally hired" Carter, and that Carter hired Taylor, but that Carter did not "typically hire employees"); *id.* at 23 (testifying she "gave [Taylor] . . . a termination notice"); *id.* at 32 (testifying that she did not "have a conversation with [Keller] about [Carter] leaving Tranquility").

Still, the fact that Keller herself did not hire or fire Plaintiffs does not dispose of this factor. Instead, the more important discussion is whether Keller had the *power* to hire or fire Tranquility employees. *See Gray*, 673 F.3d at 355. As to this question, Plaintiffs argue that because "Keller is the **only** individual with the

4

authority to hire Akhter to 'run' her business for her . . ., it is illogical for Keller to argue she did not have the authority or power to hire and fire anyone, including Plaintiffs." Dkt. 32 at 12. But the Fifth Circuit has specifically rejected this argument.

> [I]ndividuals ordinarily are shielded from personal liability when they do business in a corporate form, and it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA. Given this understanding, a status-based inference of control cannot alone suffice to create a genuine fact issue whether [Keller] had power to hire and fire [Plaintiffs].

*Gray*, 673 F.3d at 356 (cleaned up). In other words, the mere fact that Keller is the sole shareholder of Tranquility does not cloak her in authority to hire and fire Plaintiffs.

"To satisfy the first element of the economic reality test, [Plaintiffs] had to present evidence that [Keller] possessed the power to hire and fire [them]." *Orozco*, 757 F.3d at 449. Plaintiffs have not done so. As a result, this factor weighs against a finding of employer status and in favor of summary judgment.

B.  **SUPERVISION AND CONTROL OF WORK SCHEDULES AND CONDITIONS OF EMPLOYMENT**

   1.  *Work Schedules*

Keller testified she "never" discussed "day-to-day operation" of Tranquility's business with Akhter. Dkt. 31-1 at 22. Keller also testified she "never" discussed "what hours [Plaintiffs] were working" with Akhter. *Id.* at 13–14. Akhter testified that it was she who made the work schedule for Tranquility employees. *See* Dkt. 31-2 at 16. Akhter posted the schedule twice a month on a wall at the home where the business operated, and occasionally sent text messages to employees about the schedule. *See id.* Akhter also coordinated schedule changes via text message with employees. *See id.*

Considering Keller's undisputed lack of basic knowledge about the work schedules of Tranquility's employees, this fact weighs against a finding of employer status and in favor of summary judgment.

5

### *2. Conditions of Employment*

The parties dispute whether Keller supervised and controlled other conditions of employment. Keller contends she had "no role in the day-to-day operations of Tranquility" and "was merely a shareholder with an interest in the entity" who "had nothing to do with the Plaintiffs' . . . working conditions." Dkt. 31 at 7. Keller testified her only responsibility at Tranquility was "paying standard bills." Dkt. 31-1 at 8. She further testified she went to the business premises "quarterly or less . . . to do things such as check filters, make sure there wasn't leaks, those kinds of things." *Id.* at 11.

In response, Plaintiffs argue that evidence in the summary judgment record

> shows Keller was heavily involved in—and ultimately responsible for—routine and larger maintenance issues on the property, paying all the bills each month, paying the mortgage for the Home, ensuring Akhter assisted with the maintenance when [Keller] could not, being the point of contact for utility companies . . . when needed, and assisting Akhter with the police investigation regarding . . . Taylor's termination and eviction from the property.

Dkt. 32 at 5. Plaintiffs highlight the following text messages that Keller sent to Akhter, purportedly illustrating Keller's involvement in Tranquility's operations and Plaintiffs' work conditions:

- "Will you please reach out to the daughter and set up things for tomorrow[?]" Dkt. 32-8 at 5.
- "Will you please let the **caregivers** know so that they are dressed and things are ready." *Id.* at 6 (emphasis added).
- "Could you please ask the **caregiver** in the little house to pick up, including the empty bedroom. . . . Also, let me know if I need to pick up the addresses and social security numbers for last year employees." *Id.* at 9 (emphasis added).
- "Can you reach out to this son, please[?]" *Id.* at 12.
- "Could you reach out to him and see if he needs anything?" *Id.* at 14.

Other text messages between Keller and Akhter show that Keller exercised some control over employee work conditions. For example, on January 6, 2022, Akhter

6

sent a text message to Keller, asking Keller to "[please] call" because "it's v[ery] important." *Id.* at 2. Akhter told Keller the power went out at the house—an important development, because one resident there relied on an oxygen machine to breathe. Akhter told Keller to "[c]all light company ASAP," to which Keller responded that she did. *Id.* at 3. Akhter also later asked Keller to fix the television and phone for the residents. *See id.* at 6–7. Further, Akhter and Keller exchanged text messages about communicating with residents' families and the intake of potential new residents to the home. Keller testified she "functioned as a marketer" for Tranquility for a period of time. Dkt. 32-2 at 19.

In his declaration, Taylor swears he "frequently saw Tona Keller come to the house." Dkt. 32-4 at 2. Taylor observed that "Keller would come to meet with [Akhter], check in on patients, or check on the house itself." *Id.* Taylor recalls "Keller coming to the house more often than quarterly." *Id.*

> Also, when Fouzia Akhter went out of town, it was understood that Tona Keller was the person we (myself and the other caregivers) would need to contact if we needed anything. For example, if anything went wrong with the house, or a patient died, or something like that, we would need to call Ms. Keller if Fouzia was out of town. . . . I remember once when Fouzia was out of town, and Andrea Carter had left Tranquility Gardens, Ms. Keller was the person who coordinated with the new female employee coming in to work for the company.

*Id.* at 3.

As Plaintiffs point out, Taylor's declaration concerning Keller's responsibilities while Akhter went on vacation is confirmed by the summary judgment record. *See* Dkt. 32-10 at 2 (Akhter sent Keller's phone number to Carter and told Carter that Keller was "[r]esponsible while I am [o]n vacation").[1] Keller also asked Carter directly to "share [Keller's] number with the gentleman that is covering for [Carter]" and to either call or text Keller if a house cleaner did not arrive at the home. Dkt. 32-7 at 2; *see also* Dkt. 32 at 13.

---

[1] Plaintiffs' response brief includes a citation to a text message Keller allegedly sent to Akhter: "What do I need to do there while you are on vacation[?]" Dkt. 32 at 4 (emphasis removed). That text message, however, is missing from the summary judgment record.

7

Keller's best evidence is her testimony that she "went into the Home quarterly or less," Dkt. 31-1 at 11, and a text message she sent to Carter, saying Keller "do[es] not manage the business. Please reach out to [Akhter.]" Dkt. 32-7 at 2. But the Fifth Circuit has held that courts "must . . . look to the substantive realities of the relationship, not to mere forms or labels ascribed to [employees] by those who would avoid coverage." *Watson v. Graves*, 909 F.2d 1549, 1554 (5th Cir. 1990). "While it is true that, as [Keller] points out, the evidence seems to show that [Keller] did not personally supervise [Plaintiffs]' daily work, that is not the sole focus of the second element of the economic reality test, which *also* emphasizes an alleged employer's control over conditions of employment." *Morgan v. Rig Power, Inc.*, No. 7:15-cv-073, 2017 WL 11017230, at *7 (W.D. Tex. Sept. 1, 2017) (cleaned up).

Keller argues this case is analogous to my prior decision in *Kibodeaux v. A&D Interests, Inc.*, No. 3:20-cv-00008, 2022 WL 980354 (S.D. Tex. Mar. 31, 2022), where I found that an owner of a gentleman's club was not an employer under the FLSA. But there are several key differences. There, the owner went to the dancers' work areas only "from time to time," and one plaintiff complained that managers were "extra strict" or "on the prowl" when the owner was present. *Id.* at *6 (cleaned up). On one occasion, another defendant told a manager to reprimand one plaintiff. I found that those "'isolated events [were] too paltry to support an inference of control.'" *Id.* (quoting *Gray*, 673 F.3d at 356–57).

But here, according to the summary judgment record, Keller paid the mortgage for the house where the business operated, as well as all bills at the home. Keller stepped in to coordinate repairs at the home, including once when the power at the home went out. "The evidence of [Keller's] control, while sparse, involves important issues of employee workplace safety." *Gil v. De Laune Drilling Serv., Ltd.*, No. 2:16-cv-71, 2016 WL 5394261, at *2 (S.D. Tex. Sept. 27, 2016).

Keller also coordinated communication with families of residents and potential residents. The summary judgment record shows text messages between

8

Keller and Akhter regarding how to respond to concerns raised by residents' families. It is undisputed that at least once, Keller served as a point of contact for Plaintiffs when Akhter was unavailable. This evidence shows that Keller exercised some control over employment conditions at Tranquility. "[T]he fact that [Keller] claims [s]he had nothing to do with the day-to-day operations of [Tranquility] is relevant, but such control is not required." *Goetz v. Synthesys Techs., Inc.*, 286 F. Supp. 2d 796, 800 (W.D. Tex. 2003). "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence." *Id.* (cleaned up).

At this stage, I do not weigh the evidence, and I view the evidence in the light most favorable to Plaintiffs. *See Schnell*, 98 F.4th at 156. As such, I find that Keller's supervision and control of the conditions of employment at Tranquility weigh in favor of her employer status and against summary judgment.

### C.   DETERMINATION OF THE RATE OR METHOD OF PAYMENT

#### 1.   *Rate of Payment*

The parties agree that Keller did not determine Plaintiffs' rate of payment. Keller testified she "never" had "any conversations with [Akhter] about either the amount paid to [Plaintiffs]" or "the hours they worked." Dkt. 32-2 at 14. Akhter also testified she alone determined how much to pay Plaintiffs. *See* Dkt. 31-2 at 24–27. Given that Keller did not control the rate of payment, this fact weighs against employer status and in favor of summary judgment.

#### 2.   *Method of Payment*

The parties dispute the level of control that Keller had over the method of Plaintiffs' payment. Keller testified that she "signed a whole checkbook and just gave that checkbook to [Akhter]." Dkt. 31-1 at 31. Akhter then used those checks to handle Tranquility's expenses, including labor costs. Plaintiffs argue that Keller signing checks and expecting Akhter to use those checks for Tranquility's expenses means that Keller determined their method of payment.

9

In reply, Defendants contend it is "not a novel idea to pay employees by check." Dkt. 33 at 8. Neither Plaintiffs nor Defendants cite to any authority for their arguments concerning whether Keller controlled the method of payment. But I find that this issue favors Plaintiffs. A reasonable jury could conclude that blank checks signed by Keller for all Tranquility expenses—including labor—is indicative of Keller's employer status under the FLSA. *See Nieto v. Pizzati Enters.*, No. 16-5352, 2016 WL 6962513, at *10 (E.D. La. Nov. 29, 2016) (finding that plaintiff's allegations that her paychecks bore the name of defendants "indicates that [defendants] may have determined the method of payment to Plaintiff").

Plaintiffs argue that another aspect of the summary judgment record creates a fact issue as to method of payment. Keller testified that she looked at the Tranquility checking account "[m]aybe every six months" to "[e]ssentially [check] that there was enough money in there to operate and [she] didn't need to put more money in." Dkt. 31-1 at 12. She testified that, based on her examinations, she never felt the need to add more money in the account, and did not do so. *See id.* In a January 1, 2022 text message, however, Keller told Akhter: "We must make deposits. The checking account is overdrawn by $500 from last payday. We can not write more checks without making deposits unless I personally cover the payroll. I would like to put you on the account so you have access to see the balance." Dkt. 32-8 at 2.

"An individual may become personally liable if he or she decides to keep employees working despite . . . the corporation's inability to meet its statutory duty to pay the employees." *Goetz*, 286 F. Supp. 2d at 801–02 (quotation omitted). In *Barnes v. Gracia Mexican Kitchen, LLC*, the owner-defendant of a restaurant determined that the restaurant's sales could not cover its labor costs, and told a manager via email to "[p]lease cut some people ASAP." No. 2:18-cv-140, 2020 WL 13389874, at *7 (S.D. Tex. Mar. 2, 2020). The court considered this email as "some evidence [d]efendant . . . had input into the payment of wages to Gracia employees." *Id.* at *9.

10

In the January 1, 2022 text message that Keller sent to Akhter, Keller effectively communicated to Akhter that, if deposits were not made into the account, Akhter could not pay Tranquility employees without Keller's personal intervention. Of course, Keller did not go as far as the defendant in *Barnes*, where the defendant ordered layoffs. But "[n]umerous courts have considered financial control over a corporation to be a significant factor in making the 'employer' status determination." *Goetz*, 286 F. Supp. 2d at 801. Keller's communication regarding the financial health of Tranquility raises a fact issue as to her level of financial control and influence over Tranquility.

In sum, Plaintiffs pointed to evidence that checks pre-signed by Keller became Carter's paychecks. They also pointed to evidence that Keller told Akhter that Tranquility's labor costs were hurting the business, and instructed her to adjust Tranquility's finances accordingly. These facts are sufficient to create a genuine dispute as to whether Keller, in economic reality, controlled the methods of payment for Tranquility employees. As such, this factor weighs in favor of employer status and against summary judgment.

### D.   MAINTENANCE OF EMPLOYEE RECORDS

The parties agree there is no evidence that Keller maintained employee records. Akhter testified that she is "in charge of maintaining documents for Tranquility Gardens," including "signed employment agreements for the staff members." Dkt. 31-2 at 19. There appears to be no evidence of Keller keeping employee records. As such, this factor weighs in favor of summary judgment.

*  *  *

In sum, facts relevant to the economic reality test—Keller's control over the conditions of employment and Keller's determination of the method of payment—create a genuine dispute as to whether she is an "employer" under the FLSA. *See Gil*, 2016 WL 5394261, at *2–3 (denying motion for summary judgment when only two *Gray* factors created genuine disputes of material fact). When viewed in the light most favorable to Plaintiffs, the evidence contained in the summary judgment

11

record would allow a reasonable jury to find that Keller was Plaintiffs' employer. The evidence is not "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). I will leave it to the jury to make the ultimate decision as to Keller's employer status.

## CONCLUSION

For the reasons explained above, Keller's Motion for Summary Judgment (Dkt. 31) is **DENIED**.

SIGNED this 16th day of September 2024.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE